UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Adam Sorkin, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    - against -<br><br>The Kroger Co.,<br><br>        Defendant | 1:23-cv-14916<br><br>Hon. Charles P. Kocoras<br><br>First Amended<br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff Adam Sorkin ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. The ethical treatment of farm animals is an increasing concern for Americans.

2. According to a recent study, "consumers are consequently paying attention to food product labels that indicate humane production practices."[1]

3. The past several years have seen a consistent increase in the number of U.S. consumers who prefer eggs "from higher-welfare production systems and are willing to pay more for [them]."

4. Companies communicate this information through "extrinsic cues such as visual information on labels and packaging," through which consumers can make informed decisions.[2]

5. However, labeling related to animal welfare and production methods are not directly

---

[1] Thibault, M., Pailler, S. & Freund, D. Why Are They Buying It?: United States Consumers' Intentions When Purchasing Meat, Eggs, and Dairy With Welfare-related Labels. Food ethics 7, 12 (2022). https://doi.org/10.1007/s41055-022-00105-3

[2] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Product Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326.

observable in the same way as information about a product's characteristics, such as price, size, and color.

6. This is apparent as consumers walk down "the endless egg aisle [,] filled with a plethora of labels," which are often confusing.[3]

7. Since eggs produced from hens living on real farms will appear and taste like those from caged facilities, consumers lack any ability to confirm what they are told by those products' labeling.

8. Consumer Reports confirmed that "A lot of [] terms on egg cartons don't really have any defined meaning," which prevents consumers from "mak[ing] sure [they]'re getting what [they] think."

9. Seeking to prevent companies from misrepresenting the qualities of the eggs they sold, the Egg Products Inspection Act ("EPIA") prohibited deceptive labeling. 21 U.S.C. §§ 1031-1032 *et seq.*

10. This State adopted similar laws against "misbranding" of eggs, requiring that any eggs sold at retail not be advertised in a way that is misleading or deceptive. 410 ILCS 615/1 *et seq*. ("Illinois Egg and Egg Products Act"); 410 ILCS 615/6.

11. In response to the growing consumer demand for eggs produced by hens living in humane, natural conditions, The Kroger Co. ("Defendant") sells "Farm Fresh Eggs" ("Product") under its Roundy's brand at stores including Mariano's Fresh Market.

---

[3] https://www.tastingtable.com/1484318/what-egg-carton-farm-fresh/




3





12. These "Farm Fresh" eggs are sold in Mariano's stores and marketed on its website.



13. When clicking on the links of the first four Roundy's eggs, potential purchasers will see they are described as "Farm Fresh."

4



14. Unfortunately for consumers, a recent independent study from Data for Progress, titled "Cracking Down on Kroger" ("Report"), confirmed that purchasers are misled by eggs sold under its store brands, like Roundy's, which are labeled as "Farm Fresh."

5

15. This was because such eggs are not produced on anything consumers would consider a farm, but in large-scale industrial confinement.

16. In these systems, hens live short lives on a wire mesh floor in racks, unable to spread their wings.

17. For example, a white leghorn's wingspan of 32 inches is larger than the battery cages no wider than 20 inches, notwithstanding there are up to 11 birds per cage.

18. According to animal behaviorists and welfare organizations, these environments "prevent hens from engaging in critical natural behaviors such as dust bathing, perching, scratching, walking, laying eggs in a nest, and spreading their wings," which they could engage in on actual farms.

19. Not only is this cruel to the hens and misleading to consumers, "Food safety, consumer protection, and public health organizations have opposed the caging of egg-laying chickens, citing concerns related to increased risk of salmonella and other diseases."

20. The Report found that purchasers of Kroger store branded eggs wanted truthful information about the living conditions of the hens laying eggs they bought.

21. Relying on the Report, the Michigan Attorney General told Kroger "to add clear signage to your stores to help consumers understand which eggs, exactly, came from caged chickens and which did not, so as to help them be able to make informed choices on how they spend their hard-earned dollars."

22. Kroger customers often believed "farm fresh" meant the hens laying eggs were "cage free," when this was not true.[4]

---

[4] [Letter Re: Kroger Caged Chicken Eggs, Ag No. 2023-0371680-A](#), Michigan Attorney General Dana Nessel to Rodney McMullen, CEO, The Kroger Co., Mar. 23, 2023 citing Grace Adcox and

23. These beliefs are consistent with a prior study by Mintel, which observed that consumers understood "farm fresh" consistent with describing the living conditions of hens as "free range."[5]

24. The non-profit group, A Greener World ("AGW"), which "promotes practical, sustainable solutions in agriculture by supporting farmers and educating consumers," called out terms like "farm fresh" in its recent guidebook, "Food Labels Exposed: A Definitive Guide to Common Food Label Terms and Claims."[6]

25. AGW described "farm fresh" as "used to give a favorable impression of the freshness of the product or sense of immediacy – for example, implying that a farmer gathered the eggs early in the morning before rushing them to the store ready for purchase."

26. This would be misleading in circumstances like the Roundy's "Farm Fresh" eggs, where they "come from caged hens in large industrial facilities."

27. Elizabeth Okusun from Tasting Table agreed that "farm fresh" "invokes images of eggs freshly picked from a cozy barn, delivered to your door along with fresh bottles of milk," which "creates a pleasant image in the mind of the consumer," even though the Roundy's "farm fresh" eggs are not produced by hens in such conditions.[7]

28. Experts in animal welfare agreed, as "farm fresh" "literally means nothing."[8]

---

Julia Jeanty, Data For Progress, "Cracking Down on Kroger," Feb. 2023; AG Press Release, Michigan Department of Attorney General, Department of the Attorney General Sends Letter to Kroger Co. Urging Clear, Truthful Advertising of Cage-Free Eggs, Mar. 31, 2023; Kroger purchasers and customers refers to those who shop at Kroger affiliates and subsidiaries which sell eggs labeled as "Farm Fresh," among other terms.

[5] Welfare of the Laying Hen (book accessed online).
[6] https://agreenerworld.org/wp-content/uploads/2020/03/AGW-Food-Labels-Exposed-SCREEN-2-2020.pdf
[7] https://www.tastingtable.com/1484318/what-egg-carton-farm-fresh/
[8] https://www.npr.org/sections/thesalt/2014/12/23/370377902/farm-fresh-natural-eggs-not-always-what-they-re-cracked-up-to-be

29. While "farm fresh" has no legally defined meaning in the context of eggs, the United States Department of Agriculture ("USDA") knew invoking a farm in food labeling could mislead the public about the quality and attributes of what they were buying.

30. For this reason, it prohibits "[the] term[] 'farm' [from]…be[ing] used on labels in connection with products unless such products are actually prepared on the farm." 9 C.F.R. § 317.8(b)(2)

31. Consumers understand a "farm" similarly to what the USDA had in mind, as a small agricultural system, including a traditional barn and abundant hay.

32. "Farm Fresh" directly and indirectly tells purchasers the eggs they are buying were produced by hens living a natural life on a farm, pecking and playing in the fields.

33. "Farm Fresh" is misleading because the eggs labeled with this term are not produced on anything consumers would consider a farm, but in large-scale industrial confinement.

34. "Farm Fresh" is misleading because eggs labeled with this term are obtained from battery cage systems where laying hens lack minimal and/or meaningful access to the outdoors.

35. As a result of the false and misleading representations, Roundy's eggs labeled as "Farm Fresh" are sold at premium price, approximately not less than $1.49 for a dozen large white eggs, excluding tax and sales.

## Jurisdiction and Venue

36. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

37. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

38. Plaintiff is a citizen of Illinois.

39. Defendant The Kroger Co. is an Ohio corporation with a principal place of business in Ohio.

40. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

41. The members of the class Plaintiff seeks to represent are more than 100, because Roundy's products are sold at over 40 Mariano's in Illinois, a market of millions of consumers.

42. Given that eggs are a supermarket staple, the number of purchasers are likely in the hundreds of thousands.

43. Venue is in this District with assignment to the Eastern Division because Plaintiff resides in Cook County and a substantial part of the events or omissions giving rise to these claims occurred in Cook County, including Plaintiff's purchase, consumption and/or use of the Product, reliance on the representations and omissions, and/or subsequent awareness they were false and misleading.

## Parties

44. Plaintiff Andrew Sorkin is a citizen of Cook County, Illinois.

45. Defendant The Kroger Co. is an Ohio corporation with a principal place of business in Ohio.

46. Defendant is the largest grocer in the United States.

47. Roundy's is a wholly owned subsidiary of Kroger.

48. Roundy's operates 149 grocery stores under the banners of Pick 'n Save and Metro Market in Wisconsin and Mariano's in Illinois.

49. Pick 'n Save has over 100 locations in Wisconsin and Mariano's has over 40 locations in Illinois.

50. Roundy's products are sold at Pick 'n Save, Metro Market and Mariano's.

51. Though Kroger recently entered into an agreement to divest itself of Mariano's in advance of regulatory approval of its merger with Albertson's, the completion of this transaction was not scheduled to occur until early 2024.[9]

52. While Kroger sells leading national brands, it sells many products under its private label Roundy's brand.

53. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

54. Products under the Roundy's brand have an industry-wide reputation for quality and value.

55. In releasing products under the Roundy's brand, Defendant's foremost criteria was high-quality products equal to or better than national brands.

56. That Roundy's products met this high bar was or would be proven by focus groups, rating them above their name brand equivalents.

57. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

58. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

59. Plaintiff is part of the majority of Americans who care how animals are treated when they are used for production of food.

---

[9]https://www.cswg.com/news/cs-wholesale-grocers-enters-into-a-definitive-agreement-to-purchase-413-stores-available-from-the-kroger-and-albertsons-merger/

60. Plaintiff purchased Roundy's eggs labeled and packaged as "Farm Fresh" at Mariano's locations in Cook County between October 2020 and the date the Complaint was filed.

61. Plaintiff believed "farm fresh" meant eggs produced by hens living on farms, with open green space, grass, hay and straw.

62. Plaintiff relied on the term "Farm Fresh" when purchasing eggs under the Roundy's brand.

63. Plaintiff did not expect "farm fresh" to describe eggs produced by hens in industrial confinement, in cages, where they lack access to outdoors and the activities and behaviors they naturally exhibit.

64. Plaintiff believed and expected eggs labeled as "farm fresh" meant they were from hens not confined in cages.

65. Plaintiff is like the majority of Kroger customers surveyed in the Report who believed "Farm Fresh" meant eggs produced by hens not confined in cages, but which lived on farms, with the ability to engage in natural hen behaviors like pecking and rolling in dust.

66. Plaintiff bought the Product at or exceeding the above-referenced price.

67. Plaintiff will demonstrate how much more buyers like him paid for the eggs labeled as "Farm Fresh" compared to if they were truthfully labeled, through economics, statistics and/or other disciplines.

68. Plaintiff paid more for the Product, would have paid less or not had purchased it had he known the "Farm Fresh" representations and omissions were false and misleading.

69. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

Class Allegations

70. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in Illinois who purchased Roundy's eggs at Kroger subsidiaries labeled as "Farm Fresh" during the statutes of limitations for each cause of action alleged.

71. Common questions of issues, law, and fact predominate and include whether Defendant's representations and omissions were and are misleading and if Plaintiff and class members are entitled to damages.

72. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

73. Plaintiff is an adequate representative because his interests do not conflict with other members.

74. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

75. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

76. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

Illinois Consumer Fraud and Deceptive Business Practices Act<br>("ICFA"), 815 ILCS 505/1, *et seq.*

77. Plaintiff incorporates by reference paragraphs 1-35.

78. The purpose of the ICFA is to protect consumers against unfair and deceptive practices.

79. The ICFA considers false advertising and deceptive practices in the conduct of any trade or commerce to be unlawful.

80. Violations of the ICFA can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 815 ILCS 505/2; 15 U.S.C. § 45 *et seq*.

81. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, but also the extent to which it fails to reveal facts material in the light of such representations. 15 U.S.C. § 55(a)(1).

82. Defendant's false and deceptive representations and omissions with respect to the production processes of its eggs and the welfare of the hens laying such eggs are material in that they are likely to influence consumer purchasing decisions.

83. Plaintiff paid more for the Product than he would have had he known the eggs were not produced by hens living on farms, as he and reasonable consumers understood what a farm was.

84. The Product's labeling and packaging violated the FTC Act and thereby violated the ICFA because it expressly stated the eggs were "farm fresh" when they did not originate on a farm, as consumers understand this term, which is false and/or misleading.

85. The Product's labeling and packaging violated the FTC Act and thereby violated the ICFA because it impliedly suggests the eggs were produced by hens living on farms, when its statements, images and/or their implications are false and/or misleading.

86. The labeling and packaging of the Product violated the FTC Act and thereby violated the ICFA because "Farm Fresh Eggs" created the erroneous impression the eggs were produced by hens living on farms, enjoying time playing in the grass and dirt, spreading their wings, etc.

87. Violations of the ICFA can be based on public policy, established through statutes,

law or regulations.

88. The labeling of the Product violates laws, statutes, rules and regulations that are intended to protect the public.

89. The labeling of the Product violated the ICFA because the representations and omissions are misleading.

90. The labeling of the Product violated the ICFA because the representations and omissions of "Farm Fresh Eggs" was contrary to relevant federal and state requirements which prohibit consumer deception.

91. These include the following federal and state laws and regulations, described above.

| Federal | State |
|---|---|
| 21 U.S.C. §§ 1031-1032 | 410 ILCS 615/6 |
| 9 C.F.R. § 317.8(b)(2) | |

92. Plaintiff believed the Farm Fresh Eggs were from hens living on farms, with access to open green space to run around and engage in natural hen behaviors like pecking and dusting themselves on the ground, and spreading their wings even though the hens producing the eggs were kept in industrial confinement systems which did not afford them sufficient space to spread their wings nor the opportunity to engage in the traditional hen behaviors.

93. Plaintiff seeks to recover for economic injury and/or loss he sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the ICFA.

94. Plaintiff will produce evidence showing how he and consumers paid more than they would have paid for the Product, relying on Defendant's representations and omissions, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis and other

14

advanced methodologies.

95. As a result of Defendant's misrepresentations and omissions, Plaintiff was injured and suffered damages by his payment of a price premium for the Product, which is the difference between what he paid based on its labeling and marketing, and how much it would have been sold for without the misleading representations and omissions identified here.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Certifying Plaintiff as representative and the undersigned as counsel for the class;
2. Awarding monetary, statutory and/or punitive damages and interest;
3. Awarding costs and expenses, including reasonable attorney and expert fees; and
4. Other and further relief as the Court deems just and proper.

Dated: March 8, 2024

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com